UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

REALITY LUCAS,

Defendant.

21-Cr-382 (SHS)

OPINION & ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

A Manhattan grand jury issued a one-count Indictment charging defendant Reality Lucas with being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and (2). Defendant Reality Lucas has now filed a motion to dismiss the indictment on the grounds that the Manhattan grand jury that indicted Lucas was not drawn from a fair cross-section of the community and thus violated the Sixth Amendment to the U.S. Constitution and the Jury Selection and Service Act ("JSSA"). For the reasons set forth below, Lucas's motion is denied.

## I.  BACKGROUND

Pursuant to the JSSA, the U.S. District Court for the Southern District of New York has implemented a written plan for the random selection of grand and petit jurors. 28 U.S.C. § 1863; *Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York* ("Jury Plan"), https://www.nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf. Under the Jury Plan, two Master Jury Wheels are constructed every four years, one for the Manhattan courthouses and one for the White Plains courthouse. The Manhattan Master Wheel, which is the relevant wheel for the trial of this action, includes residents of New York, Bronx, Westchester, Putnam and Rockland counties. Once or twice a year, the Clerk of Court draws from the Manhattan Master Wheel a list of names to whom jury questionnaires will be sent. The Clerk then reviews the returned questionnaires and the names of all eligible jurors constitute the Manhattan Qualified Jury Wheel. The Clerk then publicly draws at random from the Manhattan Qualified Jury Wheel to fill the need for grand and petit juries.

## II.  SIXTH AMENDMENT CLAIM

"The Sixth Amendment guarantees a criminal defendant a jury selected from a fair cross section of the community." *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996) (citing *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975)). Courts employ the following three-part conjunctive test first articulated in *Duren v. Missouri*, 439 U.S. 357 (1979), to evaluate claims that a jury was not selected from a fair cross section of the community:

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364. The government may then rebut a defendant's prima facie case by showing that "a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367-68.

As explained below, Lucas's fair-cross-section claim fails. Even if there were sufficient underrepresentation to satisfy prong two of the *Duren* test, Lucas has not shown that any underrepresentation is due to systematic exclusion embedded within the jury-selection process.

## A. *Duren* Prong One: Distinctive Groups

For prong one of the *Duren* test, Lucas must show "that the group alleged to be excluded is a 'distinctive' group in the community." *Duren,* 439 U.S. at 364. Here, Lucas alleges that Black or African-American individuals and Hispanic or Latino individuals are members of two "distinctive" groups in the community and that those groups are underrepresented in the Manhattan Qualified Wheel. "There is little question that both Blacks and Hispanics are 'distinctive' groups in the community for purposes of this test," *United States v. Jackman,* 46 F.3d 1240, 1246 (2d Cir. 1995); indeed, the parties agree that Lucas satisfies prong one.

## B. *Duren* Prong Two: Underrepresentation

Under *Duren*'s second prong, Lucas must show "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Duren,* 439 U.S. at 364. To make such a determination, the Court must (1) identify the relevant jury pool or pools, (2) determine the appropriate statistical method to measure underrepresentation of the distinctive groups in the jury pool or pools, (3) determine the demographic composition of the relevant community and the applicable jury pool or pools, and (4) consider whether any alleged underrepresentation is sufficient to satisfy the *Duren* underrepresentation requirement.

### 1. *Relevant Jury Pool*

The Court must first define the relevant jury pool or pools. "The relevant jury pool may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three." *United States v. Rioux,* 97 F.3d 648, 657 (2d Cir. 1996). Lucas's arguments address the compilation of both the master wheel and the qualified wheel. (ECF

2

No. 14.) The government suggests that the Court consider both wheels (ECF No. 15), pointing out that "the court must assess representativeness in the context of the systematic defect identified by the defendant." *United States v. Rioux*, 930 F. Supp. 1558, 1568 (D. Conn. 1995), *aff'd*, 97 F.3d 648 (2d Cir. 1996). Accordingly, the Court will address the compilation of each wheel.

## 2. *Statistical Method*

Next, the Court must consider a method of quantifying any alleged underrepresentation. This Circuit has considered three available statistical methods to evaluate a fair-cross-section claim: (a) statistical decision theory, (b) comparative disparity, and (c) absolute disparity. The Circuit consistently employs the absolute disparity method. *United States v. Rioux*, 97 F.3d 648, 655–56 (2d Cir. 1996) (finding that the "absolute disparity approach is most appropriate for analyzing the underrepresentation claims"). *See also United States v. Lawrence*, No. 21 CR. 127 (PGG), 2021 WL 3500838, at *7 (S.D.N.Y. Aug. 9, 2021) (same); *United States v. Scales*, No. 19-CR-96 (JSR), 2021 WL 3129244, at *1 (S.D.N.Y. July 22, 2021) (same); *United States v. Schulte*, No. S3 17 CR. 548 (PAC), 2021 WL 1146094, at *7 (S.D.N.Y. Mar. 24, 2021) (same).

## 3. *Demographics*

### a. *Community Population*

Lucas and the government largely agree on the proportion of the distinctive groups in the applicable community. They also agree that "the appropriate measure in this case is the eighteen and older subset of the population, regardless of other qualifications for jury service." *Rioux*, 97 F.3d at 657. By using data from the 2019 5-year American Community Survey ("ACS"), Lucas contends that Black individuals comprise 21.19% of the population while Hispanic individuals comprise 28.44% of the population. (Def. Mem. 7, ECF No. 14.) By using the 1-year 2019 ACS data, the government estimates that these groups compose a larger share of the community: Black individuals comprise 21.80% and Hispanic individuals comprise 29.29% of the population. (Gov't Mem. 8, ECF No. 15.)

### b. *Manhattan Master Wheel*

Because there is no self-reported data regarding race and ethnic composition of the master wheel, the government expert, Dr. Bernard R. Siskin, employed what is referred to as a geocoding and Bayesian Improved Surname Geocoding technique, finding that the master wheel population is 20.46% Black and 29.25% Hispanic. (Gov't Mem. 11-12, ECF No. 15.) Lucas, however, contends that the government's technique overestimates the number of Black and Hispanic individuals in the master wheel. Specifically, Lucas's expert, Jeffrey Martin, seeks to demonstrate that the geocoding technique overestimates the number of Black and Hispanic individuals as follows:

> While the group of persons on the Qualified Jury Wheel who have self-reported their race and who we can geocode because they have a valid zip code is 16.11% Black or African-American, the geocoding estimation would be 16.33% Black or African-American. While the group of persons on the Qualified Jury Wheel who have self-reported their ethnicity and who we can geocode because they have a valid zip code is 19.43% Hispanic or Latino, the geocoding estimation would be 22.12% Hispanic or Latino.

(Martin Decl. ¶ 102, ECF No. 16).

Even if the Court were to both (i) assume the accuracy of Martin's computation and (ii) assume that geocoding will tend to overestimate representation of Black and Hispanic individuals, the overrepresentation is minimal: a 0.22 percentage point increase for Black individuals and a 2.69 percentage point increase for Hispanic individuals. Accordingly, Dr. Siskin's computation affords the Court with a not so rough estimate of the composition of the Manhattan Master Wheel.

### c. Manhattan Qualified Wheel

Last, the parties agree on the composition of the Manhattan Qualified Wheel: 16.08% Black and 19.41% Hispanic. (Gov't Mem. 11, ECF No. 15; Def. Mem. 7, ECF No. 14.)

### 4. Measure of Underrepresentation

#### a. Master Wheel Underrepresentation

Lucas offers no evidence that Black and Hispanic individuals are underrepresented on the Manhattan Master Wheel in a manner that violates prong two of the *Duren* test. Only Dr. Siskin computes the absolute disparity between the master wheel and the community, finding that "[t]he percent African American of the master jury wheel is 1.34 percentage points lower than that of the community, (20.46% versus 21.80%) and the percent Hispanic of the master jury wheel is 0.04 percentage points lower than that of the community (29.25% versus 29.29%)." *United States v. Gilmore,* 19 Cr. 724 (JGK) ECF No. 88-1, at ¶8 (Mar. 12, 2021). As the government correctly observes, these absolute disparities "fall[] comfortably within the range deemed acceptable by the Second Circuit and other courts." ECF No. 15, at 14; *See e.g., United States v. Rioux,* 97 F.3d 648, 658 (2d Cir. 1996) (finding that absolute disparities of 1.58%, 2.08%, and 2.14% were "such meager numbers that do not present an infirmity of constitutional magnitude").

#### b. Qualified Wheel Underrepresentation

Underrepresentation on the Manhattan Qualified Wheel is a closer call. Both Lucas and the government provide data showing underrepresentation of Black and Hispanic individuals on the Manhattan Qualified Wheel that *may* be sufficient to satisfy the second *Duren* prong. By comparing the demographics of the community population and the Manhattan Qualified Wheel, Lucas argues that the absolute disparities are 5.11% for Black

individuals and 9.03% for Hispanic individuals. (ECF No. 14.) By using the government's estimate of the community demographics, the absolute disparity is even more favorable for Lucas's case: 5.72% for Black individuals and 9.88% for Hispanic individuals. (ECF No. 15.)

As the government rightly notes, "the Second Circuit has not specifically approved a disparity as high as 9.88%." (ECF No. 15, at 14.) In one instance, the Second Circuit found an absolute disparity of 2.5% and 3.4% sufficient to satisfy this second *Duren* prong. *United States v. Jackman*, 46 F.3d 1240 (2d Cir. 1995). But two years later, in *United States v. Ramnath*, the Second Circuit found larger percentage point disparities insufficient. No. 97-1202, 1997 WL 738584 (2d Cir. Nov. 21, 1997) (summary order) (finding that because the absolute disparities of 3.45% for Black individuals and 4.87% for Hispanic individuals "are comparable to those found to be constitutional under the Sixth Amendment's fair cross-section provision in *United States v. Biaggi*, [the appellant] fails to satisfy the second prong of the test set forth in *Duren v. Missouri*") (internal citations omitted).

Ultimately, the Court need not render a finding on the second *Duren* prong because Lucas has clearly failed to establish the third *Duren* prong.

## C. *Duren* Prong Three: Systematic Exclusion

*Duren* prong three requires that Lucas show that any underrepresentation is "due to systematic exclusion of the group in the jury-selection process." *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Lucas wrongly asserts that one "may establish . . . systematic exclusion by showing that the underrepresentation occurred over a significant time period." (ECF No. 14, at 9). Rather, a defendant must articulate how one or more factors causes any underrepresentation and may not merely list potential causes. *Berghuis v. Smith*, 559 U.S. 314, 332 (2010) ("No 'clearly established' precedent of this Court supports [the defendant's] claim that he can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation.") (emphasis in original). Moreover, and importantly, any "systematic exclusion" must be "due to the system of jury selection itself, rather than external forces." *Rioux*, 97 F.3d at 658.

Lucas fails to offer any support for a finding that an underrepresentation of Black and Hispanic individuals is due to a systematic feature of the Southern District's jury selection process. Instead, Lucas posits a host of potential causes of the disparity, including the exclusion of inactive voters (Martin Decl. ¶53, ECF No. 14-2), the exclusion of individuals who registered to vote since the last refilling of the Manhattan Master Wheel (*Id*. ¶70), and the nonresponse of individuals to the qualification questionnaire. (*Id*. ¶85.) Lucas simply fails to show any causal impact of one or more factors on underrepresentation of Black and Hispanic individuals on the Manhattan Qualified Wheel.

First, Lucas points to how the District draws its master wheel "exclusively from voter registration rolls, which underrepresent the number of jury-eligible Black and Latino New

5

Yorkers." (ECF No. 16, at 9.) Yet Lucas's expert offers no data to show that drawing the Manhattan Master Wheel exclusively from voter registration rolls *causes* the underrepresentation of Black and Hispanic individuals in the Manhattan Qualified Wheel. *See* Martin Decl. ¶106, ECF No. 16-2.

Second, Lucas claims that "the District only refills its master wheel every four years, which arbitrarily removes jury-eligible 18-21 year[] olds from the prospective jury pool, and elevates those with stable housing over those without it." (ECF No. 16, at 9.) Again, Lucas's expert offers no supporting data to show causation. *See* Martin Decl. ¶¶107-108, ECF No. 16-2.

Third, Lucas claims that "the Southern District chooses to remove inactive voters from the wheel, which again disparately impacts Black and Latino individuals." (ECF No. 16, at 9.) Once again, Lucas's expert fails to substantiate the underrepresentation claim with data showing causation. *See* Martin Decl. ¶82, ECF No. 16-2.

Fourth, Lucas states that "the jury administrator fails to attempt to reach jurors who do not respond to their questionnaires . . . [when] deemed undeliverable." (ECF No. 16, at 9.) Here too, Lucas's expert provides no supporting data. *See* Martin Decl. ¶ 112, ECF No. 16-2.

Fifth, Lucas states that "the jury administrator fails to attempt to reach jurors who do not respond to their questionnaires . . . for any other reason," apart from the fact that the questionnaire was deemed undeliverable. (ECF No. 16, at 9.) Once again, his expert offers no data demonstrating an impact on underrepresentation. *See* Martin Decl. ¶¶ 113-114, 118, ECF No. 16-2.

Because "evidence of mathematical disparity, without more, is insufficient to make out a prima facie case of improper jury selection," *Anderson v. Casscles*, 531 F.2d 682, 685 (2d Cir. 1976), Lucas has failed to satisfy prong three of *Duren. See also United States v. Neilly*, No. 21-CR-94 (VEC), 2021 WL 3913559, at *3 (S.D.N.Y. Sept. 1, 2021) (citing *Anderson* for the proposition that "evidence of mathematical disparity, without more, is insufficient"); *United States v. Suquilanda*, No. 21 CR 263 (VM), 2021 WL 3500868, at *4 (S.D.N.Y. Aug. 9, 2021) (same); *United States v. Tagliaferro*, No. 19-CR-472 (PAC), 2021 WL 1172502, at *4 (S.D.N.Y. Mar. 29, 2021) (same). Accordingly, Lucas's claim that the Manhattan Master Jury Wheel and the Manhattan Qualified Jury Wheel are not drawn from a fair cross section of the community fails.

## III. JURY SELECTION AND SERVICE ACT CLAIM

Lucas raises three separate claims under the Jury Selection and Service Act: first for underrepresentation of Black and Hispanic individuals; second for "the total exclusion of inactive' voters"; and third for the exclusion of "voters with alternate mailing addresses in Putnam County." (ECF No. 14, at 14.) As limned below, none succeed.

### A. Underrepresentation

First, Lucas's JSSA claim regarding an underrepresentation of Black and Hispanic individuals fails for the reasons set forth in the earlier consideration of the *Duren* test. "[T]he *Duren* test governs fair-cross-section challenges under both the Act and the sixth amendment." *United States v. LaChance,* 788 F.2d 856, 864 (2d Cir. 1986) (consideration of *Duren* for the statutory claim "disposes of [defendant's] constitutional claim").

### B. Inactive Voters

Second, Lucas's claim regarding the exclusion of inactive voters also fails. County election boards designate a voter as "inactive" when they obtain "information indicating that a voter may no longer be living at her address of registration" and state law "requires the names of inactive voters to be omitted from the poll books that are issued by most County Boards and used by poll workers at poll sites on election days." *Common Cause/New York v. Brehm,* 432 F. Supp. 3d 285, 290 (S.D.N.Y. 2020) (citing N.Y. Elec. Law § 5-213(2)). Inactive voters are unable to vote by regular ballot, and must instead use an affidavit ballot. *Id.* at 291.

The Clerk of Court's reliance on county election boards' lists of active voters is not clearly inconsistent with the JSSA. The JSSA contemplates the use of "voter registration lists," 28 U.S.C. § 1863(b)(2), and county poll books that omit inactive voters can be read as one of the "official records maintained by State or local election officials of persons registered to vote." 28 U.S.C. § 1869.

Moreover, even if the exclusion of inactive voters were a failure to comply with the JSSA, it would not rise to the required level of being a "substantial failure." *United States v. Raysor,* No. 99-1503(L), 2001 WL 36037731, at *2 (2d Cir. 2002) ("[I]n order to prevail on a JSSA challenge, a defendant must show a 'substantial failure' in proportional representation. Mere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply with its provisions."). The government reports that "[t]he omission of inactive voters has a negligible effect of the representativeness of the jury pool, resulting in the underrepresentation of Black persons by 0.18% and Hispanic persons by 0.26%." (ECF No. 15, at 24.) Lucas provides no rebuttal to those statistics.

### C. Select Putnam County Residents

Last, Lucas claims that exclusion of "voters with alternate mailing addresses in Putnam County from the qualified wheel violates the JSSA." (ECF No. 14, at 14.) The government concedes that the exclusion was an error but urges that it is "exactly the sort of minor technical error that does not make out a JSSA claim." (ECF No. 15, at 24.) The government's expert explains that correcting the error would have resulted in the addition of 56 individuals to the Manhattan Qualified Wheel of 69,524 and would "trivially lower the percent of persons on the qualified jury wheel that were African American and Hispanic." *United States v. Gilmore,* 19 Cr. 724 (JGK) ECF 88-1, at ¶¶18, 38 (Mar. 12, 2021). A trivial

alteration in percentage representation, caused by an inadvertent clerical error, cannot constitute a failure that would result in a jury wheel violating the JSSA.

## IV. CONCLUSION

Because Lucas has failed to show that any underrepresentation of Blacks and Hispanics in the Southern District jury wheels is due to systematic exclusion of those groups and because those wheels do not violate the JSSA, the Court denies Lucas's motion to dismiss the indictment.

Dated: New York, New York
October 21, 2021

SO ORDERED:

Sidney H. Stein, U.S.D.J.