
**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

November 28, 2022

**VIA ECF**

Honorable Judge Sidney H. Stein
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

  **Re: <u>United States v. Reality Lucas</u>,**
     **21 Cr. 382 (SHS)**

Dear Judge Stein:

     Reality Lucas was born with crack cocaine in his veins. From the hospital, he was immediately placed into the foster care system – where he would spend much of his childhood. With Mr. Lucas' grandmother struggling as an alcoholic, his mother dealing with crack addiction, and his older siblings managing their addictions as well, it is little surprise that Mr. Lucas developed an addiction of his own that ultimately led to the commission of this offense. While many might feel a sense of helplessness when facing a federal crime, Mr. Lucas has used this arrest as a catalyst for change. Indeed, in the year and seven months since Reality Lucas' arrest in the instant case, he has defied all of the odds. Despite a long history of addiction to ecstasy, Mr. Lucas has successfully participated in treatment at Samaritan Village. As Mr. Lucas explains, "[s]ince I'm sober now, I know things will be different because I won't let my pride, ego, and high influence my actions." Letter of Reality Lucas, attached as Exhibit A. Additionally, he maintained stable employment at Abel Building Services, where he worked as a building concierge, and has been a steady and consistent provider and presence for his only son, Malakhi and Malakhi's two half-brothers, whom Mr. Lucas treats as his own. Mr. Lucas has worked hard to overcome a childhood shadowed by poverty, instability, and addiction. Of course, these experiences have come with a cost as Mr. Lucas meets the criteria for Complex Post-Traumatic Stress Disorder as a result of his "sustained, repeated, and/or multiple forms of traumatic exposure." <u>See</u> Psychological Report by Dr. Edward Fernandez, attached as Exhibit D.

     As with other challenges he has faced, Mr. Lucas has reflected deeply about the factors that brought him to where he is today. He is committed to staying on the right path and, with the exception of his marijuana use, had been in full compliance with his Pretrial Services conditions for the year and four months of his release until his post-plea self-surrender in September 2022.

For the reasons set forth more fully below, including his traumatic upbringing, familial support, as well as his newfound sobriety and other efforts to better himself, I respectfully request that Your Honor sentence Mr. Lucas to time served to be followed by a term of supervised release, to include six months of home detention.

## Background

Mr. Lucas was born on October 19, 1991 in New York, NY to Dorothy Lucas. From birth, Mr. Lucas and his five siblings faced difficult circumstances. His mother was a crack addict, who used the drug during her pregnancy, causing Mr. Lucas and his siblings to be sent into foster care. His father was nowhere to be found.

Foster care was a significant part of Mr. Lucas' upbringing.  For the first three years of his life, Mr. Lucas lived with a relatively stable foster care family until his foster mother passed away. However, that experience quickly changed when he was moved to his second foster family at three years old.  There, Mr. Lucas experienced physical and emotional abuse, including limiting Mr. Lucas' food so he could not eat the food the rest of the family had, locking him in his bedroom for extended periods of time, or having him soak in a bathtub for hours as punishment.  Sexual abuse at the direction of his foster mother also persisted in the home.  As Mr. Lucas' brother, Donis Lucas, recalls, "it was really hard being separated those years."  Letters of Support, attached as Exhibit B, at 1.  The time in foster care was only made worse upon the passing of Mr. Lucas' brother, David, in 1994, while their mother was still in treatment.  David, who was only 18 years old, was hit by a car and passed away after he entered a post-surgical coma.  Eventually, in 1996, Mr. Lucas' mother was able to regain custody of Mr. Lucas when he was five years old, allowing him to reunite with his older siblings.

While Mr. Lucas and his siblings were happy to return to their mother's care, the children still faced great challenges.  Indeed, in 2001, Mr. Lucas's grandmother, who had herself struggled with alcoholism, passed away.  This was a devastating loss for the entire family, especially Mr. Lucas' mother, who then began using drugs again.  When Mr. Lucas' mother used drugs, it was difficult for the children.  As his brother, Donis, describes, "It was hard not having your mom to help you growing up.  There wasn't food in the house, so we'd go hungry a lot.  We had each other, but it was rough.  It was just us and our older sister looking after us, since our mom wasn't around."  Ex. B at 1.  In 2006, Mr. Lucas' mother was arrested and, again, he and his siblings returned to the foster care system.  Unlike last time, however, Mr. Lucas' eldest sister, Melissa, obtained kinship custody over him.  While this was a better situation than at his prior abusive foster care family, Mr. Lucas' relationship with his sister was fraught as he believed she used him for the social services check as he was neglected and left to provide for himself during this time.

In 2009, when Mr. Lucas was around 18 years old, he tried ecstasy for the first time. Eventually, Mr. Lucas would use approximately five ecstasy pills a day on a near daily basis to maintain his addiction.  Mr. Lucas attributes his use and addiction to ecstasy as the basis for his prior conviction as well as his current case.  Indeed, Mr. Lucas' 2015 arrest, the prior temporary orders of protection, and the instant matter were all acts committed under the influence of ecstasy. Mr. Lucas, however, with the assistance of Samaritan Village, stopped using ecstasy since the commission of the instant offense.  Mr. Lucas' motivation to stop using ecstasy has been

2

multifactorial. However, more than anything, Mr. Lucas wanted to regain a sense of control over his life and his reactions. Mr. Lucas explains the role ecstasy had during the instant offense: "[o]nce I calmed down and sobered up more that night I felt so scared and worried that I might physically hurt someone. I was so thankful no one was hurt, but I also had to face what I had done. If I wasn't high that night, I probably could've just walked away from it." Ex. A. Indeed, Mr. Lucas' brother, Donis confirms this sentiment: "I know Reality won't make the same mistake again, because he is sober now. That night, he came to me after, and I could tell how under the influence he was. Once he sobered up, things were completely different." Ex. B at 1. As Mr. Lucas' Samaritan Village counselor observes, Mr. Lucas exhibited progress in his year of treatment. Letter of Counselor Adriana Vargas, attached as Exhibit C. Moreover, not only was Mr. Lucas able to tackle his addiction to ecstasy in treatment, but he was also able to successfully address his marijuana addiction. Ex. C.

In 2018, Mr. Lucas met his later girlfriend, Ebony Meyers, at a cookout. As Ms. Meyers describes it, from then on, they "were inseparable." Ex. B at 3. Even though Ms. Meyers had two sons from a prior relationship that did not dissuade Mr. Lucas. Indeed, Mr. Lucas "became their father figure . . . . he treated them as if they were his own and so did his family." Ex. B at 3. As Ms. Meyers describes it, "my sons began calling him dad and he would tell everyone that the boys were his sons, not stepsons but his sons." Id. Soon after, Mr. Lucas and Ms. Meyers had their own son together, Malakhi, who is now 3 years old. Malakhi was born with severe asthma that has led to multiple hospitalizations, which was a strain on Mr. Lucas and Ms. Meyers. It also made the pandemic particularly stressful for them as they feared COVID-19 – a respiratory virus – would pose particularly dangerous outcomes for someone with Malakhi's condition. Although Ms. Meyers and Mr. Lucas are no longer in a romantic relationship, they nonetheless coparent the three boys together and have a positive relationship. As Ms. Meyers explains: [w]hether we are in a relationship or not, I want nothing but the best for him so that he can continue to grow into a great man and be a great father." Ex. B at 4. Since his incarceration, the separation between Mr. Lucas and his three sons has been particularly challenging for the family: "[m]y kids and family are my world, so being away from them is killing me inside. . . . Every time I speak to them, they ask when I'm coming back and that hurts me the most." Ex. A.

Mr. Lucas' devotion to his family was on full display when his mother, who has now remained sober for fifteen years, received a stage 4 colon cancer diagnosis in 2021. Upon hearing the news, Mr. Lucas took it upon himself to be his mother's primary caretaker. Indeed, Mr. Lucas took care of his mother after her surgery and escorted her to her biweekly chemotherapy appointments. Her treatments caused unpleasant symptoms that Mr. Lucas helped her manage. Moreover, he took care of day-to-day tasks around the home and paid her bills when she could not pay for them herself. As his mother explains, "[h]e gave me the strength to go on." Ex. B at 2. Although Mr. Lucas' mother is fortunately now in remission, there is still concern that her prognosis can change.

Mr. Lucas' ability to provide for his children and mother has been a source of great pride for him. Though his mental health and substance use issues has at times made maintaining employment difficult, he has remained steadily employed in a union job for the past five years at Abel Building Services. In 2017, when Mr. Lucas first started there, he worked as a temporary porter. Soon after, he was hired as a full-time porter. Later, he was promoted to concierge – a

unionized position. It was only due to his need to self-surrender for the instant case that ended his employment there.

## Mental Health Evaluation

In light of Mr. Lucas' traumatic life experiences and lack of mental health intervention, it became clear to our office that a psychological evaluation was necessary to assess the impact these lived experiences have had on Mr. Lucas' mental health. Accordingly, our office retained a psychologist, Dr. Edward Fernandez, to better understand Mr. Lucas' mental health and provide potential treatment recommendations, which are included in his 11-page psychological report. Ex. D.

After reviewing records, conducting a clinical interview as well as a mental status examination of Mr. Lucas, Dr. Fernandez concluded that Mr. Lucas "would meet the criteria for a Complex Post-Traumatic Stress Disorder (CPTSD)" which is the result of "sustained, repeated, and/or multiple forms of traumatic exposure." Ex. D at 8. As Dr. Fernandez explains, "[w]ith CPTSD, it [is] predominantly characterized by emotional sensitivity, reactive anger, and poor coping responses, such as [] problematic [] substance use. Mr. Lucas appears to meet criteria for a severe cannabis use disorder and severe ecstasy use disorder and severe alcohol use disorder." Id. (emphasis in original). Dr. Fernandez opines that "Mr. Lucas's extensive substance use likely influenced his decision-making processes and resulting behaviors throughout his life. His substance use also appears to be associated with his inability to cope effectively with dysregulated emotions, which is common in people with characteristics of CPTSD." Id.

According to Dr. Fernandez, healthy and nurturing experiences in early childhood years "are critical to the development of a healthy functioning person. However, lack of positive, supportive and validating experiences during this period are associated with abnormal brain development which can lead to problems with cognitive growth." Ex. D at 8. Mr. Lucas' life "experiences are marked by a long history of trauma and neglect perpetrated by his caretakers and family environment throughout his formative years." Ex. D at 9. "Despite this, Mr. Lucas made attempts to progress while also acknowledging that his environment and social network did not support seeking/supporting alternative ways to manage his circumstances or mental health. This contributed to more extreme forms of interpersonal conflict, distress, anxiety, and depression, which he appeared o manage by progressively increasing his abuse of substances." Id.

With respect to treatment recommendations, Dr. Fernandez concludes that Mr. Lucas would benefit from "[i]ntensive outpatient treatment [which] could assist [in] placing him into treatment with peers that are also working on managing addiction and developing coping skills to lead an abstinent lifestyle." Ex. D at 10-11. With respect to mental health treatment, Dr. Fernandez opines that "Mr. Lucas be reassessed for medication that address his current psychiatric symptoms based on his current sobriety. In addition, Mr. Lucas would benefit from regular psychotherapy to address cognitions and behaviors and develop more healthy forms of coping mechanisms while processing the multiple forms of trauma he has experienced throughout his life." Ex. D at 10. Finally, Dr. Fernandez recommends that Mr. Lucas receive vocational support as he has had difficulty maintaining employment given his untreated substance use and mental health symptoms. Accordingly, "[h]e could benefit from continued support in achieving these goals through job

training programs and assistance in finding employment." Id.  Ultimately, Dr. Fernandez concluded that "Mr. Lucas has a positive prognosis as he displayed insight into his mental health and substance use, expressed genuine remorse on his previous behaviors, and appears motivated to engage in treatment for sustained change." Ex. D at 11.

### Instant Offense

As set forth in the complaint, the instant arrest was the product of an investigation into Mr. Lucas for the unauthorized possession of ammunition that resulted from a shooting, in violation of 18 U.S.C. § 922(g)(1).  On February 8, 2021, at approximately 11:55pm, shots were fired in the vicinity of 115th Street and Second Avenue in New York County where two shell casings were recovered.  Surveillance video and social media photo comparisons led the officers to believe Mr. Lucas was the shooter.  In a post-arrest interview, Mr. Lucas immediately admitted guilt to the instant offense.

As Mr. Lucas explains in his letter, he accepts full responsibility for his actions, is deeply remorseful, and understands the seriousness of his conduct:

> On the day of the offense, I was high off ecstasy and very drunk – I was not in the right state of mind.  I know how wrong that was, and that I never should have done what I did.  I thank God no one was hurt.
>
> I am very remorseful of my actions.

Ex. A.  He deeply regrets the lack of judgment he showed through his misconduct. He recognizes that he has disappointed his family and undermined his ability to serve as a role model and parent for his three sons. Altogether, Mr. Lucas counts this experience as the worst in his life and even contemplated suicide at one point.  Fortunately, however, Mr. Lucas has chosen to fight for himself and for his sons and continue to forge a path of success ahead.

### A Sentence of Time Served With Supervised Release to Include Six Months of Home Detention is Appropriate in this Case

Congress requires District Courts to impose a sentence that is "sufficient, <u>but not greater than necessary</u> . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a) (emphasis added). The Second Circuit has explained that, "[i]n deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment . . . a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted).

When determining the appropriate sentence, District Courts must consider the Federal Sentencing Guidelines, but need not abide by them. See United States v. Booker, 543 U.S. 220, 264 (2005). District Courts vary or depart from the guidelines quite frequently -- in fact, the majority of federal sentences are now outside of the guidelines range. See U.S. Sent'g Comm'n, Quarterly Sentencing Updates, available at https://www.ussc.gov/research/data-reports/quarter/quarterly-sentencing-updates. The U.S. Sentencing Commission's preliminary report for 2021 found that guidelines sentences were imposed in only 43.1% of cases nationally, and just 19.5% of cases in the Southern District of New York. See id.  This trend has been stable over the past several years.  Since 2013, SDNY judges have consistently sentenced approximately 75% of their defendants outside of the guidelines range. See id.

In this case, a downward variance is appropriate. Specifically, we respectfully request a sentence of time served plus a term of supervised release, six months of which to be completed in home detention.  Such a sentence is warranted because it will account for Mr. Lucas' tragic past that has caused unaddressed mental health issues, his sobriety where drug use was the primary cause of the instant offense, his supportive family, his future plans for success, and the horrific conditions of confinement he is currently experiencing at the MDC.

### A. The Advisory Guidelines

Mr. Lucas has pleaded guilty to felon in possession of ammunition pursuant to a plea agreement. All parties agree that he is therefore subject to a total offense level of 15.  With a total criminal history score of three, Mr. Lucas falls in Criminal History Category II.  The guidelines, therefore, yield 21-27 months. While probation recommends a downward variance to 366 days, this is variance is insufficient and remains unnecessarily punitive.  PSR at p. 22.  Most significantly, it does not adequately account for Mr. Lucas' mental health and drug treatment needs or for the particularly challenging conditions Mr. Lucas has faced while incarcerated at MDC.  For the reasons detailed below, the guidelines sentence and probation's recommendation for only a five-month variance would be inappropriate and result in a greater than necessary punishment. See Nelson v. United States, 555 U.S. 350, 352 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.") (emphasis in original).

### B. Mr. Lucas' traumatic life circumstances and need for continued drug and mental health treatment warrants a time served sentence.

As described in detail above, Mr. Lucas' life has been rife with trauma, abandonment, and setbacks. This history is a reason to grant a variance to time served. See 18 U.S.C. § 3553(a)(1). In spite of all of these obstacles, Mr. Lucas remains a steadfast and loving person, who is kind-hearted and caring for his loved ones. See Ex. B. As Mr. Lucas' best friend, Jamal Fowler, describes him, "[i]t's shocking to me how big Reality's heart is, knowing all the things he's been through." Ex. B at 5.

However, Mr. Lucas' mental health, and accompanying substance abuse, warrant a downward variance.  As Dr. Fernandez outlined in his report, Mr. Lucas presents with Complex

Post-Traumatic Stress Disorder as a result of his repeated and sustained traumatic experiences, especially those from early childhood. His substance abuse, an unhealthy coping mechanism for his unaddressed mental health concerns, requires intensive outpatient treatment – a level of treatment that he will not receive while incarcerated.

Significantly, if Mr. Lucas was not an addict, we would not be here today. Indeed, the two criminal cases that comprise Mr. Lucas' criminal history were a byproduct of his addiction. The instant offense certainly would have been avoided if Mr. Lucas had not been high on ecstasy. In short, addressing Mr. Lucas' addiction will reduce his risk of recidivism. 18 U.S.C. § 3553(a)(2)(D) instructs the Court "to provide the defendant with needed . . . medical care . . . in the most effective manner." Subsections (B) and (C) instruct the Court to deter Mr. Lucas from future criminal conduct and protect the public. See United States v. Stewart, 590 F.3d 93, 172 (2d Cir. 2009) (noting that the "deterrence" in 3553(a)(2)(B) includes specific deterrence). A few more months in the MDC will accomplish neither – effective addiction treatment will accomplish both.

Mr. Lucas has not received effective addiction treatment at the MDC. A few years ago, Judge Rakoff asked the Federal Defenders to produce expert testimony about the relative efficacy of addiction treatment in community and carceral settings. See Sent'g Tr. at 10-13, United States v. Corporan, 18 Cr. 166 (S.D.N.Y. Feb. 19, 2019). The Federal Defenders commissioned Dr. John Mariani, Director of Substance Treatment and Research Services at Columbia Medical Center, who concluded that the mot effective treatments in addiction therapy are almost always unavailable to incarcerated patients. See Rep. Dr. Mariani, Corporan, 18 Cr. 166. In community settings, however, advances in addiction treatment have been shown to significantly reduce the likelihood of future drug use and future criminal behavior. See id. at 6-7.

Mr. Lucas desperately wants to stay sober. Before Mr. Lucas was even arrested for the instant offense, he was committed to living a sober life and permanently ending his addiction to ecstasy. As Mr. Lucas and his brother describe in their letters, the February 2021 incident scared Mr. Lucas into sobriety. See Ex. A; Ex. B at 1. Mr. Lucas, who is described by so many as a tender, loving person, recognizes that he turns into a much different person when under the influence of ecstasy. As such, even before he faced federal charges for his conduct, Mr. Lucas promised himself that he would never touch ecstasy again – and he has kept true to that promise.

During the year and four months that Mr. Lucas was on pretrial supervision, he made sure to attend his treatment sessions at Samaritan Village. His commitment to his sobriety was on full display when he would even bring his son with him to treatment sessions when he could not find a sitter. Ex. C. As Mr. Lucas recognizes, this crime and his criminal history have been fueled by his addiction and his inability to control his reactions while under the influence. Accordingly, Mr. Lucas – to ensure that he does not recidivate – needs to return to the community to continue his treatment.

Notably, even while detained at the MDC, Mr. Lucas has maintained his sobriety. That is no small feat – the MDC is "infested with drugs" and inmates "can get drugs and other contraband at the drop of a hat." Sent'g. Tr. at 15, United States v. Morgan, 19 Cr. 209 (S.D.N.Y. May 5, 2020). Yet Mr. Lucas has abstained. In fact, Mr. Lucas has not obtained a single disciplinary infraction during his time at MDC. The most effective medical care for Mr. Lucas' addiction is available in the community, not at the MDC. Therefore, in order to allow Mr. Lucas to access that care and thereby reduce the likelihood of future crime, a downward variance of time served is warranted.

### C. Mr. Lucas' Family Situation Warrants a Downward Variance

Before he self-surrendered, Mr. Lucas was an active part of the life of his three sons. Now, Mr. Lucas awaits his release so he can return to the present father and financial provider he was prior to his incarceration.

Mr. Lucas' sons deserve their father back. As Ms. Myers explains: "Malakhi's too young to understand why we cannot call Reality and why we cannot see him. It is hard on me because there is no uncomplicated way to explain to a 3-year-old that their parent must go away for a while." Ex. B at 3. Children like Malakhi and his brothers experience a unique hardship when their parents are incarcerated during their developmental years. "Having a parent incarcerated is a stressful, traumatic experience of the same magnitude as abuse, domestic violence and divorce, with a potentially lasting negative impact on a child's well-being." See Annie E. Casey Foundation, A Shared Sentence: the Devastating Toll of Parental Incarceration on Kids, Families and Communities 3 (Apr. 2016).[1]

By all accounts, Mr. Lucas is an excellent father. He supports his family financially and emotionally. A downward variance is warranted both to allow Mr. Lucas to continue to provide for his family, and in recognition of the fact that Mr. Lucas' strong family unit reduces his likelihood of recidivism. See McKiernan et al., Creating Lasting Family Connections: Reducing Recidivism With Community-Based Family Strengthening Model, Crim. Just. Pol'y Rev., vol. 24(1), 94-122 (2013).[2]

### D. Mr. Lucas' crime, while serious, does not demand additional time in prison.

Mr. Lucas' crime was serious, and he is deeply ashamed for his actions that night. He knows guns are dangerous and has spent the last year and seven months regretting his actions. He also knows this is not his first run-in with the criminal justice system, and he recognizes the need to change. That said, given his addiction-fueled conduct that he is committed to addressing,

---

[1] Available at https://assets.aecf.org/m/resourcedoc/aecf-asharedsentence-2016.pdf

[2] Available at https://journals.sagepub.com/doi/full/10.1177/0887403412447505?casa_token=Nzd1e6URZu AAAAAA%3AFqYSA5jT7YDcQ1pcXSxRgkJLWLpw_4O4QMgBqbN_cIrz-hQueben72PIwFuzOJv3U7jDeGVT3_wWt

his familial support, the fact that no one was a hurt, and his overall conduct while on a lengthy period of pretrial supervision, a sentence of time served is still appropriate.

Should the Court accept the defense's recommend sentence, it would not create an unwarranted sentencing disparity. See 18 U.S.C. § 3553(a)(6). In 2020, courts in this District imposed a sentence in 61 firearm cases. Table 10, U.S.S.C., Statistical Information Packet, Fiscal Year 2020. In those cases, 52.5% of defendants were sentenced below their advisory Guideline range. Id. at Table 10. As such, a sentence below the Guideline range, including sentences of time served, would be completely in-line with District norms. See United States v. Mouzon, 16 Cr 284, ECF No. 53 (S.D.N.Y. Mar. 27, 2017) (McMahon, CJ.) (sentencing a defendant with a Guideline range of 30 to 37 months to time served (zero months in prison)); see also United States v. Nivar, 19 Cr 902, ECF No. 37 (S.D.N.Y. Jul. 29, 2021) (Torres, J.) (sentencing defendant with a Guideline range of 33 to 41 months to time served (less than six months in prison)); United States v. Figueroa, 18 Cr 293, ECF No. United States v. Garcia, 18 Cr 178, ECF No. 44 (S.D.N.Y. Apr. 17, 2019) (Ramos, J.) (sentencing defendant with a Guideline range of 24 to 30 months to time served (zero months in prison); United States v. Robinson, 16 Cr 235, ECF No. 31 (S.D.N.Y. Feb. 10, 2017) (sentencing a defendant with a Guideline range of 15 to 21 months to time served (less than three months in prison)).

**E. Mr. Lucas' future plans to move from his current community and obtain employment warrant a time served sentence.**

Mr. Lucas' ability to not just maintain, but excel, in his employment is a clear indication that he has the ability and desire to be a productive member of society. It is particularly impressive that Mr. Lucas has been able to do so while fighting addiction and unmanaged mental health issues. While Mr. Lucas has enjoyed his work as concierge at Abel Building Services, he hopes to ultimately pursue a career in electrical or plumbing work upon his release. Ex. A.

Moreover, Mr. Lucas' mother, who plans to move to Poughkeepsie, New York, looks forward to having Mr. Lucas move with her upon his release to ensure that he can start life anew with her. This move to Poughkeepsie will be significant for Mr. Lucas as research has shown that when a person, upon release from prison, lives in a new community, there is a lower risk of recidivism. See Dana Goldstein, You Can't Go Home Again, Justice Lab at The Marshall Project, June 4, 2015; [3] Victoria Priester, Starting Over In New Neighborhoods Helps Ex-Offenders Stay Out of Jail, Duke Research Blog, Apr. 3, 2019. [4] Moving to Poughkeepsie will be a significant catalyst for Mr. Lucas' life upon his release from incarceration. Mr. Lucas will be moving to a new environment without the same negative social influences he had in his life before the instant offense. As Mr. Lucas explains, "[i]t's important that I move to a new community and away from my old block." Ex. A. He will also have the love and support of his mother with whom he is incredibly close. With his sobriety, employment, familial support, and a new community, Mr. Lucas is sure to thrive and successfully reintegrate as a contributing member of society.

---

[3] https://www.themarshallproject.org/2015/06/04/you-can-t-go-home-again
[4] https://researchblog.duke.edu/2019/04/03/starting-over-in-new-neighborhoods-helps-ex-offenders-stay-out-of-jail/

### F. Mr. Lucas' pressing dental emergency and the current conditions of confinement at MDC warrant a time served sentence.

In the best of times, the conditions at in the Bureau of Prison's ("BOP") facilities are harsh. See, e.g., United States v. Saldana, 17 Cr. 512, ECF No. 535 at 16–17 (S.D.N.Y. Sept. 10, 2019) (Wood, J.) ("I am aware the conditions at the MCC are very dreadful, and it is my intention to give every defendant who has suffered in that way a break because of that."). Mr. Lucas has had the misfortune to being incarcerated in MDC Brooklyn since September 2, 2022. As the Court knows, staff shortages which has caused increased lockdowns and violence has plagued the MDC since the advent of the COVID-19 pandemic.

The way the BOP has handled the COVID-19 outbreak, by failing to adequately protect its inmates from transmission has been a failure. The combination of constant lockdowns, lack of social visiting, limited legal visits, staff shortages, lack of educational and vocational programming, and rampant contraband have made BOP facilities unsafe, scary, and far more punitive than they were in the past (when they already had a healthy reputation for harshness).

In Mr. Lucas' case, the MDC has failed to provide him with dental treatment despite repeated requests from Mr. Lucas and defense counsel. Mr. Lucas began experiencing severe dental pain not long after he entered custody. Unfortunately, Mr. Lucas had a dental procedure scheduled to address the hole in his tooth, but could not have the procedure completed prior to his self-surrender date. Since then, Mr. Lucas has had difficulty eating and sleeping as a result of the pain, which he experiences daily. In addition to his repeated requests to obtain dental treatment, Mr. Lucas has also sought ibuprofen or Tylenol to alleviate some of the pain; however, neither have been available in commissary. Quite simply, MDC's disregard for Mr. Lucas' treatable and manageable pain is inhumane, especially where it is interfering with his day-to-day living. Moreover, the BOP's neglect of both Mr. Lucas' and defense counsel's requests is particularly troubling and demonstrates a pattern that will undoubtedly continue throughout Mr. Lucas' term of incarceration. A time served sentence will allow Mr. Lucas to obtain the dental care he so desperately needs

The Court should consider these harsh conditions in crafting a just sentence. Courts have long recognized that sentencing judges may grant leniency based upon unduly harsh treatment in custody. This has proven especially true during the COVID-19 pandemic, where every court to sentence a defendant has had to reckon with the Bureau of Prison's failure to contain the virus and the harsh conditions of the MDC's perpetual lockdown. See, e.g., United States v. Carrillo-Berber, 18 Cr. 703 (S.D.N.Y. Jun. 11, 2020) (Crotty, J.) (sentencing a defendant to time served in part because of the harsh conditions of confinement during the COVID-19 pandemic); United States v. Brito, 20 Cr. 63 (S.D.N.Y. Jan. 13, 2021).

The challenge of federal prison will be even harder for Mr. Lucas to navigate as he will be unable to benefit from the programming that Dr. Fernandez identified as a treatment plan to address his addiction issues and obtain adequate mental health treatment. Given that Mr. Lucas has spent three months in these conditions and a year and four months under pretrial supervision, it is not necessary to punish him with additional time in prison. He need not spend another day in BOP custody. A variance due to these harsh conditions is both necessary and appropriate.

**Conclusion**

      Justice would not be served by giving Mr. Lucas further imprisonment in this case. With a dental emergency, severe addiction issues, and mental health concerns, his needs have not and will not be addressed at a BOP facility. Mr. Lucas' year and four months on pretrial release and three months of incarceration, have been more than sufficient to deter him from any future criminal conduct. Simply put, Mr. Lucas, who is now diligently working towards his sobriety, will never do anything like this again. According to Dr. Fernandez, Mr. Lucas would benefit from interventions targeted towards dynamic needs that contributed to the circumstances of his current involvement with the justice system. He described Mr. Lucas as appearing to be "motivated to engage in treatment for sustained change," and stated that he would benefit from involvement in intensive outpatient drug and alcohol treatment, mental health treatment, and vocational training. None of these interventions have been available to Mr. Lucas during his incarceration. We believe that with continued supervision, programming, and employment, Mr. Lucas will continue thriving just as he was on pretrial release. A term of incarceration will only continue to stop this progress.

      Thank you for your consideration of this request.

      Very Truly Yours,

/s/ *Marisa K. Cabrera*
Marisa K. Cabrera
Assistant Federal Defender
Federal Defenders of New York

Cc: AUSA Camille Fletcher